UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-80562-ROSENBERG

GUNTER GRANT GEIGER,
individually and as Personal
Representative of the Estate
of Gunther A. Geiger,

    Plaintiff,

v.

UNITED STATES OF
AMERICA,

    Defendant.
_____/

## ORDER ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment at docket entries 55 and 56. For the reasons set forth below, the Internal Revenue Service's[1] Motion for Summary Judgment is granted and the Plaintiff's Motion for Summary Judgment is denied.

### Introduction and Legal Framework

This is a case about the outer limits of the Internal Revenue Service's authority to collect taxes. If the IRS believes that its collection of a tax could be in jeopardy, should it be delayed in its collection efforts, statutory law compels the IRS to "immediately assess" the tax, together with all interest and penalties. 26 U.S.C. § 6861(a). A potential cause for collection delays are the normal procedures the IRS follows when a taxpayer disputes the tax. By way of example, a taxpayer may dispute a tax by litigating in the United States Tax Court. Only when a (typical) Tax

---

[1] The United States Department of Justice has appeared to represent the United States and the IRS in this case. For ease of discussion, the Court refers to the Defendant as the IRS.

Court proceeding ends in favor of the IRS may the IRS take steps to collect the tax. *See* 26 U.S.C. § 6213(a). If the IRS believes that Tax Court litigation would, through delay, impair its ability to collect a tax, the IRS may immediately initiate what is known as a "jeopardy assessment."

Jeopardy assessments are governed by 26 U.S.C. § 6861. Pursuant to § 6861, the IRS may begin its collection efforts prior to the resolution of Tax Court proceedings. *Id.* Because the collection of a tax could therefore happen before the Tax Court finishes its judicial review of the taxpayer's case, a taxpayer may seek an expedited, limited judicial review of the jeopardy assessment itself. 26 U.S.C. § 7429. That is the dispute before this Court—the Plaintiff seeks judicial review of an IRS jeopardy assessment.

This Court's review of a jeopardy assessment is limited to two questions. First, was the jeopardy assessment reasonable, given the circumstances of the case? *Id.* Second, was the amount assessed appropriate? *Id.* The IRS bears the burden of proof on the first question, and the taxpayer bears the burden of proof on the second. *Id.*

What is "reasonable under the circumstances?" It is something more than "arbitrary and capricious," but less than "supported by substantial evidence." *Magluta v. U.S.*, 952 F. Supp. 798, 801 (S.D. Fla. 1996). When determining the reasonableness of a jeopardy assessment, the scope of permissible evidence for consideration is broad: evidence not previously available to the IRS may be considered, and evidence that is inadmissible under the Federal Rules of Evidence may be considered as well. *Id.*

IRS Regulations clarify when, according to the IRS, a jeopardy assessment is reasonable:

(i) The taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself or herself.

(ii) The taxpayer is or appears to be designing quickly to place his, her, or its property beyond the reach of the Government either by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons.

(iii) The taxpayer's financial solvency is or appears to be imperiled.

26 C.F.R. § 1.6851-1. These grounds for a jeopardy assessment are not the exclusive grounds, and it is "well settled that [a court's] review is not in any way, shape or form restricted" to the three grounds quoted above. *Revis v. U.S.*, 558 F. Supp. 1071, 1074 (D. R.I. 1983). Consistent with that flexibility, courts have considered a number of factors to determine the reasonableness of a jeopardy assessment, including evidence of suspicious criminal activity, whether there are insufficient assets to satisfy the tax, whether assets have been dissipated through forfeiture or attorney's fees, and whether the taxpayer has made it difficult to locate the assets. *Magluta*, 952 F. Supp. at 802.

With the foregoing framework in mind, the Court first **(A)** summarizes the undisputed[2] facts of this case before turning to **(B)** whether the jeopardy assessment was reasonable and **(C)** whether the amount of the assessment was appropriate. Finally, the Court **(D)** enters its ruling.

### A. Undisputed Facts in This Case

In 2012, the IRS maintained a program (that has since been terminated) called the Offshore Voluntary Disclosure Program, or OVDP. The purpose of the program was to provide amnesty and protection from criminal prosecution to taxpayers who were willing to come forward and disclose income from foreign sources.[3] Taxpayers admitted that they had unpaid tax liabilities

---

2 Because the Court's decision is based upon undisputed facts, because an evidentiary hearing is not mandatory, *see Arnold v. United States*, 83 A.F.T.R. 2d 99-3018 (M.D. Fla. 1999), and because the parties agreed that an evidentiary hearing was not necessary, the Court did not hold an evidentiary hearing and instead entered its ruling as soon as possible.

3 Specifics on the OVDP program can be found at https://www.irs.gov/irm/part4/irm_04-063-003r.

from foreign sources, paid their tax, and avoided certain financial penalties and prison. One taxpayer who enrolled in the program was Gunter A. Geiger. DE 53 at 6.

Mr. Geiger was a German citizen who became a permanent resident in the United States in 1965. *Id.* In 2010, he moved to Europe. *Id.* In 2011, a foreign foundation, the World Capital Foundation, distributed all of its funds to Mr. Geiger. *Id.* Mr. Geiger did not report that income to the IRS when he filed his income tax return in 2011. *Id.* In 2012, however, Mr. Geiger applied for admission into the OVDP program. *Id.* The IRS approved Mr. Geiger's application, and, soon thereafter, Mr. Geiger informed the IRS that he had received undisclosed income (from the World Capital Foundation and from other sources as well) from 2003 through 2010. *Id.* In what would become a critical fact in this case, Mr. Geiger informed the IRS that the World Capital Foundation **was a grantor trust**.[4] *Id.* at 7. Based upon that fact, Mr. Geiger completed under penalty of perjury a worksheet that computed the total amount he owed the IRS: $6,280,737. *Id.*

Mr. Geiger made an initial payment on the six million dollars amounting to just less than two million dollars. *Id.* at 8. In early 2015, before Mr. Geiger made any additional payments, Mr. Geiger died. *Id.*

The personal representative of Mr. Geiger's estate was his son, Mr. Grant Geiger. *Id.* Grant Geiger is the Plaintiff in this case, both in his individual capacity and as the personal representative of his father's estate. *Id.* A few months after the Plaintiff's father's death, the IRS sent the Plaintiff a letter. *Id.* In that letter, the IRS asked the Plaintiff to approve and conclude the 2012 OVDP program by agreeing that his father had received income from a grantor trust and that the amount of tax owed was close to the amount previously computed by his father. *Id.* In response, the

---

4 The parties do not dispute that a grantor trust is a type of trust that receives unfavorable tax treatment.

4

Plaintiff declined to agree. *Id.* Instead of agreeing that his father had received income from a grantor trust, the Plaintiff took the position that his father had received income from a **non**-grantor trust, which would receive better tax treatment than a grantor trust. *Id.* In June of 2016, the IRS responded to the Plaintiff's refusal by requesting additional information about the trust. *Id.*

The Plaintiff responded to the request for information by May of the following year, 2017. *Id.* Several years passed and, in April of 2020, the Plaintiff filed a statement with the IRS asserting, again, that his father had received income from a non-grantor trust. *Id.* A few months later, the IRS responded and it again informed the Plaintiff that its position was that the trust was a grantor trust, not a non-grantor trust. *Id.* at 9. The IRS again requested that the Plaintiff approve and sign a document concluding the OVDP program and treating his father's income as derived from a grantor trust. *Id.* The Plaintiff again refused to sign the document and instead informed the IRS in 2021, for the first time, that: "the Estate distributed $14.4 million to the beneficiaries, leaving $1 million to deal with winding up the OVDP" and that "the Estate of Gunter A. Geiger has no assets . . . and the beneficiaries of the Estate are unable to pay the balance due with the current treatment that the World Capital Foundation is a grantor trust as they do not have enough assets to make the payment." *Id.* Years passed without payment, and the IRS officially removed the Plaintiff's father from the OVDP program on January 6, 2023. *Id.* at 4.

<u>What happened to the assets of the estate?</u>

Soon after receipt of the IRS letter about his father's outstanding tax liability, the Plaintiff met with Swiss bankers and consulted with trust attorneys in the United States. *Id.* at 9-10. According to the Plaintiff, the value of the estate at that time was about fifteen million dollars, well

5

in excess of the amount the IRS claimed it was owed.[5] *Id.* at 9. The Plaintiff entered into a settlement agreement with his mother, wherein the Plaintiff would receive $5.43 million from the estate "free and clear of any and all encumbrances." *Id.* at 10. His mother was to receive the remaining portion of the estate, but her share was to remain encumbered for any taxes that may be owed to the IRS. *Id.* Soon thereafter, in July of 2017, the Plaintiff transferred the $15 million in assets to four irrevocable Wyoming trusts. *Id.*

After the assets were transferred to the Wyoming trusts, the Plaintiff and his mother requested that the trustee, from time to time, distribute funds from the trusts for their personal expenses. *Id.* at 11. At least some of those requests were granted. *Id.* One such personal expense was the purchase of a personal residence for the Plaintiff. *Id.* at 12. Another was a *Beauty and the Beast* themed wedding that was featured in *Brides* magazine, with a cost in excess of $173,000. DE 64. During this period of time, the Plaintiff's mother referred to the Plaintiff as "a great money manager" and that she was receiving "tax free earnings." *Id.* Also during this period of time, the Plaintiff reported minimal income and expenses in excess of $25,000 per month.[6] *Id.* at 13. Although the record is unclear precisely how much of the assets were distributed from the Wyoming trusts to the Plaintiff and his mother for personal expenses, after several years of disbursements is when the Plaintiff informed the IRS that neither he nor the trusts were able to pay the tax liability sought by the IRS. *Id.* at 12. As of 2023, the assets of the Wyoming trusts included offshore accounts. *Id.* at 13.

---

5 The Court acknowledges that the decedent's tax liability for 2012 (and possibly 2011) would have been substantial, and that the 2011/2012 tax was not included in the decedent's worksheet.
6 The Plaintiff raises a vague dispute that these amounts are not accurate in the present, but he does not provide any up-to-date information on his income and expenses. DE 62 at 7.

The Jeopardy Assessment

Because the Plaintiff did not agree to pay the amount of tax sought by the IRS, the IRS removed the Plaintiff's father from the OVDP program, increasing the amount of tax liability owed to the IRS. *Id.* at 13-14. As a result, the IRS issued a notice of assessment against the estate in December of 2023 in an amount approximating fifteen million dollars. *Id.* at 13. At the same time, the IRS issued a notice of jeopardy assessment. *Id.* at 14. The IRS issued the same against the Plaintiff individually because he had transferred to himself assets of the estate and also because, as a fiduciary of the estate, he had refused to pay the estate's tax liability. *Id.* The Plaintiff filed this case a few months later, on May 1, 2024.

**B. The Reasonableness of the Jeopardy Assessment**

The IRS argues that the jeopardy assessment was reasonable based upon the following. First, the Plaintiff distributed and transferred almost all of the estate's assets without informing the IRS. Second, the Plaintiff attempted to impair the ability of the IRS to collect the assets by placing them in irrevocable Wyoming trusts. Third, the Wyoming trusts further attenuated the collection abilities of the IRS by investing the funds in illiquid assets, including foreign accounts and foreign entities. Fourth, the Plaintiff made the decision, as a fiduciary of the estate, to transfer ownership of the funds to himself and to his mother, even though the Plaintiff knew the estate's tax liability remained outstanding and unpaid, leaving the estate with insufficient funds to pay the tax as determined by the IRS. Fifth, the Plaintiff and his mother lack sufficient income to pay their personal expenses, depend upon consumption of the estate/trust assets for their personal expenditures, and lack sufficient assets to pay the income tax in dispute in this case. When all of

these facts are taken into account, the IRS argues, it can reasonably be anticipated that, barring a jeopardy assessment, the Plaintiff and his mother will continue to dissipate the assets in the future.

In response, the Plaintiff emphasizes the slowness of the IRS actions in this case, such as the multi-year delay between his informing the IRS of the (depleted) assets of the estate and the IRS termination of the OVDP program. He also emphasizes that he has at all times provided the IRS with the documents it requested and that the Wyoming trusts are available to pay tax liabilities,[7] once those liabilities are conclusively determined.

The Court concludes that the jeopardy assessment was reasonable for the following five reasons, each of which is delineated in **bold** below.

**First**, the governing statute before this Court, 26 U.S.C. § 7429, does not require that the IRS act with any particular speed. Indeed, courts have noted that § 7429 is "most notable for its silence" and lack of specific requirements. *See Revis*, 558 F. Supp. at 1074. Relatedly, although the Plaintiff disputes whether he is "quickly" dissipating the assets of the estate (discussed below), even that is not a requirement of § 7429. All that this Court must decide is whether the jeopardy assessment was reasonable, given the unique facts of this case. For the reasons set forth in greater detail below, the jeopardy assessment was reasonable and that is all that § 7429 requires.

**Second**, it is true that the IRS has identified three circumstances that, according to the IRS, satisfy the reasonableness requirement of § 7429. 26 C.F.R. § 1.6851-1. It is equally true that one of those circumstances is when a taxpayer is quickly dissipating funds that could be used to pay the disputed tax liability. *Id.* But even if the Court were to confine its decision to this narrow

---

7 The Plaintiff does not contend, however, that the Wyoming trusts have sufficient assets to pay the full amount of tax sought by the IRS.

8

question—quick dissipation—the Court is persuaded that the risk of the Plaintiff's quick dissipation of estate assets in the future is sufficiently great that a jeopardy assessment is warranted.

The persuasive, undisputed evidence relied upon by the IRS on this issue goes to the Plaintiff's state of mind. He could have kept sufficient assets in the estate's possession to pay the tax at issue (as determined by the IRS), but he didn't. He could have told the IRS of his plan to disburse almost the entirety of the estate's assets to himself and his mother, but he didn't. He could have disbursed the estate's assets to himself and kept the funds carefully preserved[8] in an amount sufficient to pay the tax sought by the IRS (should the IRS prevail), but he didn't. He could have kept the estate's assets entirely in the United States, but he didn't. He could have declined to use the estate's assets for personal expenditures, but he didn't. He could have provided evidence to this Court that neither he nor his mother lack sufficient income to avoid the depletion of the estate's assets in the future, but he has not done so. Instead, what the evidence shows is a systemic pattern—the Plaintiff uses the estate's assets, which he decided to disburse to himself, for his personal expenditures when he chooses.[9]

Because the assets in the Wyoming trusts are insufficient to pay the disputed tax in this case, should the IRS prevail, every dollar that is spent or lost from the trusts in the future further depletes the funds available to pay the estate's tax liability. *See Clark v. U.S.*, 57 A.F.T.R. 2d 86-550 (N.D. Fla. 1985) (finding that the spending of money, together with the taking of loans against

---

[8] Much of the assets were depleted on items other than personal expenditures. For example, at the Plaintiff's direction $8 million was invested in a small business that, subsequent to the investment, experienced "catastrophic losses," such that it is "unclear if the business the [Plaintiff and his mother] invested in will be able to survive." DE 53-15 at 8.
[9] The Plaintiff relies upon the fact that the Wyoming trustee controls the funds and that he can only request—not require—funds from the trustee, but the record shows that when the Plaintiff and his mother have asked for funds in the past, funds have been provided to them by the trustee. The Court is therefore unpersuaded that the trustee's facial control of the funds is a meaningful distinction, at least as to the specific question before the Court.

assets to purchase a home, was dissipation of the taxpayer's funds). Based upon the undisputed evidence in this case, the Court is persuaded that the Plaintiff poses a real risk to further, serious depletion of the assets of the estate in the future.

**Third**, case law on unlawful activity supports the Court's conclusion. Courts routinely look to whether there is evidence of criminal activity surrounding a jeopardy assessment, reasoning that such activity increases the probability that a taxpayer will try to flee the United States or otherwise place the funds outside of the reach of the United States. *E.g., Magluta*, 952 F. Supp. at 802. In grappling with these questions, courts sometimes struggle with the reality that while there may be suspicious evidence of criminal activity (such as a taxpayer possessing a large amount of cash), the taxpayer has yet to be convicted of a crime. *See id.*

Here, the Court believes that it is significant that the Plaintiff's father *admitted* that he failed to disclose large amounts of income to the IRS—there is no question that some sort of unlawful activity took place (even if it was just a failure to report) and that some of the estate's assets were therefore unlawfully retained from the United States Government. Given that undisputed fact, the Court believes that it is reasonable for the IRS to take the position that the (unlawfully retained) funds never should have been disbursed or otherwise transferred: (i) to the Plaintiff, (ii) to a trust, and (iii) to foreign accounts, as they were in this case. Indeed, courts have gone so far as to reason that the "failure to file correct income tax returns and to pay tax liabilities when due are sufficient facts to justify the jeopardy assessments." *Harvey v. U.S.*, 730 F. Supp. 1097, 1107 (S.D. Fla. 1990). Here, the Plaintiff's father admitted that he failed to file correct income tax returns, and given that he did not pay his (correct) tax liabilities in the past, he did not pay his liabilities when the liabilities were due, either.

Of course, the Plaintiff is not his father, who used trusts and foreign accounts to avoid paying United States taxes in the past, and the Court acknowledges that the Plaintiff may well have had a good faith belief that the estate's tax liability would be relatively small.[10] But what has the Plaintiff done with the funds that his father unlawfully retained from the United States Government (according to his father's own admissions) and to which the IRS clearly made a claim? He transferred the funds to trusts and, through those trusts, foreign holdings, just like his father. As the unlawfully retained funds were again placed in such a position, all without informing the IRS,[11] the Court is persuaded that the IRS has a reasonable basis to fear its collection of the funds will be impaired through delay, making a jeopardy assessment reasonable. *See Harvey*, 730 F. Supp. at 1107 ("[T]he test is whether the collection of the taxes would be rendered ineffective or jeopardized if collection efforts are delayed during the standard preassessment and pre-collection administrative review.").

**Fourth**, case law on IRS delay supports the upholding of the jeopardy assessments in this case. The Plaintiff points out that the IRS was on notice of the depletion of the estate's assets in 2021, yet the IRS waited until 2023 to take the necessary steps to put this case at issue. How can the IRS be worried about dissipation in the future, the Plaintiff reasons, if it was not very worried about dissipation in the past? That is a fair point, but it is not dispositive, and the case of *Revis v. United States* analyzed a similar fact pattern. In *Revis*, the IRS took years to act upon various

---

[10] In the event the Plaintiff's father's trust was a **_non_**-grantor trust, the Plaintiff asserts that the estate would be owed a refund from the IRS. DE 54 at 7. Even so, the IRS asserts that, were that the case, other elements of the estate's tax liability would be adjusted and, as a result, the estate would owe in excess of $20 million. DE 64 at 23.

[11] There is evidence that the Plaintiff waited years to inform the IRS of the disbursed, limited assets of the estate because of his belief that, at the time he finally informed the IRS, the statute of limitations had lapsed for the IRS to assess additional taxes. *See* DE 56 at 9.

11

information provided to it by the plaintiff. *Revis*, 558 F. Supp. at 1078.  The district court addressed the plaintiff's argument as follows:

> [W]hile some doubt legitimately exists as to whether the plaintiff's actions can fairly be characterized as a plan "quickly" to dissipate his assets, speed is, in this sort of analysis, a relative concept. It is true that the acts relied on by the defendant have spanned upwards of two and one-half years; yet the picture emerges, nonetheless, of an orderly premeditated progression which, if continued apace, is reasonably likely to leave the government holding an empty bag.

*Id.*  That is precisely the situation before this Court.  While the Plaintiff and his mother have (assuming the IRS prevails) depleted the estate's assets over the course of several years, not months, the record shows a "premediated progression which, if continued apace, is reasonably likely to leave the government" at least holding a much smaller bag, even if it does not empty the bag entirely.  The *Revis* court went on to cite to a case where a three-year delay by the IRS was held to be permissible, but it based its decision upon the § 7429 standard: was the jeopardy assessment reasonable? *Id.*  For the reasons outlined in this Order as well as the reasoning outlined in *Revis*, the jeopardy assessment was reasonable.

**Fifth**, a primary argument against the jeopardy assessment by the Plaintiff is completely irrelevant.  The Plaintiff argues that the IRS had an improper motive in bringing the jeopardy assessment, characterizing the assessment as a negotiation tactic to force the Plaintiff to concede his father's trust was a grantor trust.  Any subjective intention the IRS may have had when it made the jeopardy assessment is completely irrelevant. This Court's decision is governed by § 7429 and focuses on the objective evidence—was the assessment reasonable?  The Court's decision is *de novo*, gives no deference to the IRS, and is wholly independent. *E.g., Loretto v. U.S.*, 440 F. Supp. 1168, 1172 (E.D. Pa. 1977) ("Congress without doubt intended that the district court make a wholly independent determination on the issue of reasonableness.").  The objective evidence here

12

supported the jeopardy assessment, and the Court's analysis concludes there. *See generally Whren v. U.S.*, 517 U.S. 806 (1996) (holding that the subjective motivations of law enforcement play no role in determining whether an objective, lawful basis for law enforcement's actions exist).

### C. The Amount of the Jeopardy Assessment

The amount assessed by the IRS in a jeopardy assessment is presumed to be reasonable and appropriate. *Magluta*, 952 F. Supp. at 803. The Plaintiff bears the burden of proving the amount is not reasonable or not appropriate. *Id.* Here, the Plaintiff has not carried his burden.

The amount of the jeopardy assessment is based upon the Plaintiff's father's sworn statement that his trust was a grantor trust, and it is also based upon the Plaintiff's elective decision to disagree with his father's prior statement and to not pay any tax in the eight years since he was made personal representative of his father's estate. The Tax Court will determine whether the tax, as computed by the IRS, is correct, just as it will determine whether the trust should be treated as a grantor trust, but it is certainly reasonable and appropriate for the IRS to compute the jeopardy assessment amount based upon the Plaintiff's father's sworn statement. Stated differently, the Plaintiff has not met his burden to prove that the *computational methodology* of the amount assessed "is fatally defective, irrational, arbitrary, or unsupported." *Varjabedian v. U.S.*, 339 F. Supp. 2d 140, 157 (D. Mass. 2004). The Court's review of the amount goes no further because this case is not, and cannot be, the proper forum for the determination of the correct taxable amount. *Id.* That is for the Tax Court. This Court declines to conclude that the amount sought in the assessment is unreasonable or inappropriate.

### D. Ruling

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Defendant's Motion for Summary Judgment [DE 56] is **GRANTED** and the Plaintiff's cross-Motion for Summary Judgment [DE 55] is **DENIED**.  The Clerk of the Court shall **CLOSE THIS CASE** and all other pending motions are **DENIED AS MOOT**.  The Defendant shall submit a proposed final judgment in Microsoft Word format to rosenberg@flsd.uscourts.gov, after conferral with the Plaintiff, within two business days of the date of rendition of this Order.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 22nd day of July, 2024.

*[Signature]*
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE